**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAMUEL MORROW,<br>VICTORIA MORROW, and<br>BOARDWALK LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SCULLY ROYALTY LTD.,<br>MERKANTI HOLDING P.L.C.,<br>IEM MANAGEMENT COMPANY LIMITED, and<br>MICHAEL J. SMITH,<br><br>Defendants. | Civil Action No. [__________]<br><br>COMPLAINT AND<br>DEMAND FOR JURY TRIAL |

Plaintiffs Samuel S. Morrow ("Morrow"), Victoria Morrow, and Boardwalk LLC ("Boardwalk"), by their undersigned counsel, allege as follows against Defendants Scully Royalty Ltd. ("Scully"), Merkanti Holding P.L.C. ("Merkanti"), IEM Management Company Limited ("IEM"), and Michael J. Smith ("Smith").

**NATURE OF THE ACTION**

1. For more than a decade Michael Smith was Samuel Morrow's colleague and mentor. Under Smith's guidance, Morrow advanced through the leadership of Scully Royalty Ltd., a New York Stock Exchange-listed international merchant bank with assets around the world. Morrow joined the predecessor of Scully Royalty Ltd. as a Project Manager in 2013 before being promoted to Deputy Chief Executive Officer, then to Chief Financial Officer and finally to President and Chief Executive Officer. After being promoted to CEO, and at Smith's urging, Morrow uprooted his family from Groton, Massachusetts to lead the group from Shanghai, China. Morrow served as the company's CEO for almost five years until a decision by Smith, made over Morrow's advice, set off an extended dispute for control of the board.

2. That dispute has become increasingly contentious and appears likely to result in Smith being removed as an executive of Scully and from the board. Smith faces the loss of control of the group that he founded and is seemingly determined to retain it. He is equally determined to prevent Morrow, who holds years of institutional knowledge, from cooperating with the board supported by Scully's largest shareholders when Smith is ousted. In his effort to retain control, Smith has turned on Morrow. He has threatened Morrow, Morrow's wife, and Morrow's elderly parents with reputational and financial ruin. Most concerningly, Smith has threatened to issue a press release falsely claiming that Morrow committed financial wrongdoing, which would do lasting damage to Morrow's reputation and future prospects.

3. The truth is the reverse of what Smith claims. Morrow is a highly deliberative, moral, and conservative businessperson. In July 2026, after hearing Morrow testify and be cross-examined, the Grand Court of the Cayman Islands found him to be an "honest and credible" witness. Morrow has done nothing wrong, and Smith knows that his accusations are untrue. Just as importantly to this lawsuit, the companies Smith currently leads owe Morrow and Boardwalk millions of dollars under contracts they have breached.

4. Morrow brings this action to recover what is owed to him and Boardwalk and to obtain a declaration that he committed no wrongdoing in his service to Scully. His wife joins as a Plaintiff to clear her own name.

## PARTIES

5. Plaintiff Samuel Morrow is a natural person and a citizen of the United States and the Commonwealth of Massachusetts. He is domiciled in Groton, Massachusetts, where he maintains his permanent home and intends to remain domiciled. Morrow was Chief Financial Officer of Scully from 2017, its Deputy Chief Executive Officer from 2017 to May 1, 2021, and

its President and Chief Executive Officer from May 1, 2021 until August 13, 2026.[1] He remains a director of Scully. He is a Chartered Financial Analyst and a graduate of St. Lawrence University.

6. Plaintiff Victoria Morrow is a natural person and a citizen of the United States and the Commonwealth of Massachusetts. She is domiciled in Groton, Massachusetts, where she maintains her permanent home with Samuel Morrow.

7. Plaintiff Boardwalk LLC ("Boardwalk") is a limited liability company whose only members are Samuel Morrow and Victoria Morrow. Each member is a citizen of Massachusetts.

8. Defendant Scully Royalty Ltd. ("Scully") is an exempted company incorporated under the laws of the Cayman Islands with its principal place of business in Shanghai, China. Its common shares trade on the New York Stock Exchange under the symbol "SRL," and it files reports with the United States Securities and Exchange Commission (the "SEC"). Scully holds a net revenue royalty on the Scully iron ore mine in Newfoundland and Labrador, Canada, together with merchant banking and industrial interests. Scully is the ultimate parent of Merkanti Holding P.L.C.

9. Defendant Merkanti Holding P.L.C. ("Merkanti") is a corporation organized under the laws of the Republic of the Marshall Islands. It is a direct, wholly owned subsidiary of Scully and is the counterparty to Morrow's Employment Agreement.

10. Defendant IEM Management Company Limited ("IEM") is a company incorporated in Hong Kong with its principal place of business in Hong Kong. Smith is a director of and controls (either directly or indirectly) IEM. IEM provides services to Scully and its

---

[1] As alleged below, Morrow challenges the effectiveness of his purported removal. See ¶¶ 48, 114(h).

subsidiaries, employed Morrow in Hong Kong, and contracted with Boardwalk for services elsewhere.

11. Defendant Michael J. Smith is, upon information and belief, a citizen of Canada and the United Kingdom who is a resident of Hong Kong and China. Smith was President and Chief Executive Officer of Scully from June 2017 to May 1, 2021, has been its Executive Chairman since May 1, 2021, and since August 13, 2026 has purportedly been its interim Chief Executive Officer and Chief Financial Officer. He is a director of IEM and President of Logan International Corp. of Vancouver, British Columbia. He personally signed or sent each of the communications described below.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2). Morrow and Victoria Morrow are citizens of the United States and are domiciled in the Commonwealth of Massachusetts. Boardwalk, a limited liability company whose only members are Morrow and Victoria Morrow, is likewise a citizen of Massachusetts. Each Defendant is a citizen or subject of a foreign state. Scully is incorporated in the Cayman Islands with its principal place of business in Shanghai, China. Merkanti is a holding company incorporated in the Marshall Islands. IEM is incorporated in Hong Kong with its principal place of business in Hong Kong. Smith is a citizen of both Canada and the United Kingdom who is a resident of both Hong Kong and China. No Defendant is a citizen of any State of the United States. The amount in controversy exceeds $75,000, exclusive of interest and costs, because Morrow and Boardwalk seek unpaid compensation, default payments, contractual fees and interest, and shares or their value, which significantly exceed $75,000.

13. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202 because an actual and justiciable controversy exists. Jurisdiction rests on 28 U.S.C. § 1332, and,

where necessary, § 1367. Scully and Smith have asserted in writing that Morrow misappropriated funds, transmitted a draft press release announcing false claims of wrongdoing by Morrow; they have asserted in writing that Morrow, Victoria Morrow, and others diverted business opportunities and committed other wrongdoing, and they have indicated they will sue Morrow, Victoria Morrow, Victoria Morrow's cousin and Morrow's elderly parents on or before October 1, 2026 based on claims that are false.

14. The Court has personal jurisdiction under Fed. R. Civ. P. 4(k)(1)(A) and Mass. Gen. Laws ch. 223A, § 3(a), because each transacted business in the Commonwealth and Plaintiffs' claims arise from that business, and the exercise of jurisdiction comports with due process. Before Morrow became chief executive and before he entered into the agreements at issue, he and his family lived in Groton, Massachusetts while he worked at Scully.[2] Throughout his years in Asia, Morrow maintained his home in Groton and returned there with his family every summer. Every Defendant understood that he would return there when his service to Scully ended. Plaintiffs' claims arise from Defendants' contractual relationships with Morrow and Boardwalk, Massachusetts-directed communications and conduct, and the resulting injuries.

15. Scully purposefully availed itself of Massachusetts jurisdiction by employing a Massachusetts resident, inducing Morrow to relocate his family from Massachusetts to serve as its chief executive, contracting with him while knowing Massachusetts was his permanent home, paying compensation to accounts in the United States, and accepting performance tied to his return to Massachusetts. Scully also filed an action against Morrow in this Court on March 20, 2026, *Scully Royalty Ltd. v. Morrow*, No. 1:26-cv-11373, arising from Morrow's service as Scully's chief executive. This dispute arises from the same contractual relationships, and having invoked the

[2] Morrow also worked internationally for certain periods.

jurisdiction of this Court against Morrow concerning his service to Scully, Scully cannot be heard to say that it is unfair to be sued here by Morrow concerning the same service.

16. Merkanti purposefully availed itself of Massachusetts by entering and performing the Employment Agreement with Morrow while knowing that he maintained his permanent home in Groton, paying compensation to accounts in the United States, accepting Morrow's performance and return to Massachusetts, and continuing the employment relationship with knowledge of those contacts. Morrow's claims against Merkanti arise from Merkanti's failure to pay compensation and benefits, failure to make the contractual default payment, and failure to advance fees under that Agreement.

17. IEM purposefully availed itself of Massachusetts by employing Morrow under the IEM Contract, contracting with Boardwalk for services, paying Morrow and Boardwalk under those arrangements, and doing so while knowing that Morrow and his family maintained their home in Massachusetts. Smith, acting as IEM's director and authorized agent, sent the August 10, 2026 communication from an IEM account to Morrow and Victoria Morrow in Massachusetts. Plaintiffs' claims against IEM arise from IEM's failure to provide notice, pay Morrow, and pay Boardwalk under the IEM Contract and Boardwalk Agreement.

18. Smith is subject to personal jurisdiction in Massachusetts under Mass. Gen. Laws ch. 223A, § 3(c) and (d), because he personally negotiated and structured the relevant relationships, urged Morrow to relocate from Massachusetts, knew that Morrow and Victoria Morrow maintained their home in Groton, and caused tortious injury in Massachusetts through acts directed there. Specifically, Smith caused a threatening letter to be delivered by hand and courier to Morrow's home in Groton on June 11, 2026; sent the August 10, August 28, September 2, September 8, and September 23, 2026 communications to Morrow, and two of them to Victoria

Morrow as well, knowing that they lived in Groton; and prepared and threatened to publish a press release identifying Morrow as "of Groton, Massachusetts." Plaintiffs' claims against Smith arise from those acts and from his alleged inducement of the contractual breaches.

19. Venue is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this District, and under § 1391(c)(3), because no Defendant resides in the United States. No agreement among the parties selects another forum or requires arbitration.

## FACTUAL ALLEGATIONS

### A. Under Smith's Mentorship, Morrow Rises to Lead Scully.

20. Before joining Scully, Morrow built his career in investment management in the United States. He was Vice President of Tanaka Capital Management and served as Treasurer, Chief Financial Officer, and Chief Operating Officer of the Tanaka Growth Fund. He is a Chartered Financial Analyst.

21. Morrow joined the predecessor company to Scully Royalty in April 2013. He was named that entity's Deputy Chief Executive Officer and subsequently Chief Financial Officer in 2014. Smith, who was Executive Chairman at the time, took a close interest in Morrow's professional development. The two formed a close professional bond, speaking almost every day, six days a week, for more than a decade. In July 2017, through a corporate reorganization, Scully Royalty Ltd. was incorporated in the Cayman Islands and became the parent company of the group. Morrow was named the Chief Financial Officer of Scully Royalty, and Smith the Chairman and Chief Executive Officer. On May 1, 2021, Smith moved to the role of Executive Chairman and

Morrow succeeded him as President and Chief Executive Officer, while continuing to serve as Chief Financial Officer.[3]

22. Morrow's promotions were earned, and he was recognized within and outside Scully as an effective leader. He also had strategic vision and had the confidence of the board of directors, Scully's shareholders, and Smith himself. As Smith stated in the April 30, 2021 press release announcing Morrow's appointment as Chief Executive Officer, "We are very pleased about the actions and appointment announced today, which we believe will best position the Company to maximize value for our shareholders as we move forward."[4]

**B. Smith Persuades Morrow to Uproot His Family from Massachusetts, and the Company Gives Him Substantial Protection in Return.**

23. Scully is an international merchant bank with operations and employees around the world. Its executive office is in Shanghai, and its banking and investment interests span multiple jurisdictions across the globe. In either late 2022 or early 2023, Smith joked to Morrow "One of the two of us needs to move to Shanghai, and it's not going to be me." Morrow understood the assignment; he would have to leave his home in Groton, Massachusetts and relocate to Shanghai. In the summer of 2023, at Smith's urging, he and his wife uprooted their family from their home in Groton, took their children out of their schools, and moved to Shanghai so that Morrow could continue serving as Scully's chief executive.

24. Morrow made that commitment because the company offered him, in writing, substantial financial protection from a situation exactly like this one. His employment agreement with a Scully subsidiary, first entered into effective July 10, 2021 and subsequently entered into

---

[3]Scully Royalty Ltd., Team, https://www.scullyroyalty.com/team.

[4] Scully Royalty Ltd., Press Release, Scully Royalty Ltd. Provides Corporate Update and Announces Actions Seeking to Maximize Shareholder Value (Apr. 30, 2021), https://www.prnewswire.com/news-releases/scully-royalty-ltd-provides-corporate-update-and-announces-actions-seeking-to-maximize-shareholder-value-301281474.html.

with Merkanti Holding plc on October 1, 2025 (the "Employment Agreement"), promised him a salary, retirement contributions, health insurance for his household, and schooling for his children while they lived abroad. It promised him a lump sum of more than his annual compensation if he was terminated without cause in connection with a change of control of the company. It also provided that if the company stopped paying him and failed to cure the default, it would owe him a further lump sum, advance his legal fees for enforcing his rights, and pay interest on amounts owed. The parties agreed in writing that these provisions were fair and reasonable and were not penalties.[5]

25. Scully's board, with Smith sitting on it, approved those protections and disclosed them to Scully's shareholders in public filings with the Securities and Exchange Commission, including the dollar amount Morrow would receive on a termination connected to a change of control.[6]

26. Smith advised Morrow at every step. It was Smith who designed the structure through which Morrow would be paid. Morrow's employment as Chief Executive Officer of the group was documented through an employment agreement with Merkanti Holding plc. Morrow's work in Hong Kong was done under an employment contract with IEM, which Smith signed as its director. His work in China was done under a contract with a Chinese subsidiary. And certain of his services were provided through a company of his own, formed for Morrow and his wife by IEM in August 2020 under the name Sherwood Ltd. and later renamed Boardwalk, which IEM paid under a written services agreement. Smith recommended that structure for Morrow, and IEM

[5] In an abundance of caution in respect to confidentiality agreements in the relevant contracts, the terms are described generally. Later in the proceeding Morrow will move the Court to file these contracts under seal.

[6] Scully Royalty Ltd., Proxy Statement for the Annual General Meeting of Shareholders to Be Held December 27, 2025, at 13 (Nov. 28, 2025) (furnished on Form 6-K, Dec. 5, 2025) (the "2025 Proxy Statement"); id., Notice of Annual General Meeting (signed by Michael Smith, Executive Chairman).

Management, which Smith controls, coordinated the incorporation and administration of Boardwalk. The arrangement was consistent with Morrow's agreements with the Scully group, was approved by Scully's board, and was disclosed in public filings with the Securities & Exchange Commission on an annual basis.

27. The Boardwalk arrangement carried protections of its own. The Boardwalk Agreement provided for specified payments to Boardwalk if IEM terminated the arrangement or defaulted on its payment obligations.

28. In May 2025 the Board of Directors of Scully also approved the issuance of vested shares to Morrow and to Boardwalk in settlement of Morrow's outstanding stock options. Neither Morrow nor Boardwalk ever received these shares. On information and belief, they were delivered instead to a fiduciary under Smith's control, and Smith has refused Morrow's requests to deliver them.

**C. During Morrow's Tenure, Scully Returns Capital to Shareholders**

29. Within weeks of Morrow's appointment, Scully announced that it would focus its efforts on enhancing shareholder value and maximizing dividends from its iron ore royalty, and its board adopted a cash dividend policy. In 2021, the company paid two tax-free stock dividends that increased the number of shares outstanding by approximately 18% without diluting shareholders. In 2022, it paid four cash dividends. It paid further cash dividends in 2023 and in February 2025.[7] Scully's shareholders came to expect that the company would return the royalty's cash to them, and Morrow agreed that it should.

[7]Scully Form 20-F for 2021, Item 8 (Dividends); Scully Form 20-F for 2023, note 21; Scully Form 20-F for 2024, note 21; Scully Investor Resources, https://www.scullyroyalty.com/investors.

**D. Against Morrow's Advice, Smith Refuses to Continue Paying the Dividend and Sets Off a Fight for Control of the Company.**

30. Scully's largest shareholder is a group affiliated with Peter R. Kellogg, including IAT Reinsurance Company Ltd., which beneficially owns approximately 35.8% of Scully's shares. Its second-largest outside shareholder is MILFAM LLC, a shareholder of more than twelve years, which owns approximately 13%. Together with their affiliates, they now beneficially own approximately 48.5% of Scully.[8]

31. In mid-2025, Morrow recommended to Smith that Scully continue to declare dividends, consistent with Scully's publicly disclosed dividend policy. Smith, however, rejected this recommendation. Scully has paid no dividend since February 2025.

32. Smith's decision began a contest for control of the company. On November 25, 2025, MILFAM gave notice that it would nominate a full slate of five directors to replace Scully's board at the annual meeting set for December 27, 2025, with its first emphasis on "driving execution on [Scully's] own stated objective of maximizing earnings and dividends from its iron ore interest…" When the board rejected the nominations as untimely, MILFAM went to court in the Cayman Islands, and on December 19, 2025 the Grand Court held that its nomination notice had been validly and timely delivered.

33. Under Morrow's Employment Agreement, a shareholder's solicitation of proxies to replace a majority of the board is a "Change of Control" as defined therein. The solicitation of a new board of directors qualified as a "Change of Control" (and indeed, was precisely the type of change in control the provision was intended to encompass).

---

[8]Schedule 13D/A of Peter R. Kellogg et al. (July 31, 2026); MILFAM Proxy Statement (Dec. 8, 2025).

**E. Two Boards Claim to Govern Scully, and Morrow Resolves to Follow Whichever One the Court Says Is Legitimate.**

34. Days before the meeting, the incumbent board announced that it was postponing it. MILFAM said the postponement was invalid and held the meeting anyway, on December 27, 2025, without a single director present. The following day, MILFAM announced that its five nominees had been elected; the incumbent board rebutted and said they had not. The two boards each claimed to govern Scully.

35. There was uncertainty about who was the rightful board, and the question was the subject of litigation in the Cayman Islands. Morrow's fiduciary duty, however, ran to the company and its shareholders, and he understood that meant following the direction of its lawful board, whichever that turned out to be. This was not a matter of choosing a personal ally, it was the course Morrow understood his legal obligations to require. Morrow's decision to follow whichever board the court recognized as lawful conflicted with Smith's demand that Morrow support Smith personally.

36. On January 12, 2026, the MILFAM board announced that it had fired Morrow for cause. However, the "cause" it gave was that Morrow had declined to take its instructions and had continued to follow the incumbent board while the court decided which board was real. Undaunted, and in light of the conflicting instructions, Morrow kept working.[9]

37. With one board claiming to have fired him and the other asking him to stay, Morrow was in a difficult position. One suggestion that Smith made and ultimately implemented was that Morrow be paid the change-of-control payment provided for in his agreement. This was heavily discussed between Smith and Morrow and Smith insisted that it would be appropriate and adequate

[9] MILFAM press release (Jan. 12, 2026), https://www.sec.gov/Archives/edgar/data/16859/000110465926003705/tm263235d1_ex99-1.htm.

compensation. In or around March or April 2026, Smith instructed his assistant (not Morrow) to issue that payment to Morrow.

38. In the months that followed, Morrow kept the company running through the most disruptive period in its history. Competing instructions from the two boards reached the company's subsidiaries and the operator of the mine that pays its royalty, and the royalty ended up in interpleader in Canada. The company's independent auditor resigned. On March 20, 2026, Morrow was served with a lawsuit in this Court in Scully's name. In early May, the New York Stock Exchange suspended trading in Scully's shares. Through this period, Morrow continued to stand alongside Smith: he defended the Cayman litigation and in late May 2026, gave evidence at trial in support of their position.

39. But Morrow would not promise Smith more than his fiduciary duties allowed. In early May 2026 he had told Smith plainly that he, as an officer of the company, would follow the instruction of whatever board ended up prevailing. That meant that if the court held that the MILFAM directors had been validly elected, Morrow would take his direction from them, as the company's lawful board. That was what his fiduciary duty required. It was also the decision that would ultimately destroy Morrow's relationship with Smith and lead to this lawsuit.

**F. Smith Demands Personal Loyalty and Turns on Morrow.**

40. For Smith, loyalty to the company's lawful board was not enough. He demanded personal loyalty. From the moment Morrow said he would cooperate with a new board if validly elected, Smith treated him with increasing suspicion, and soon treated him as an adversary.

41. Smith moved quickly against Morrow. He hired a security guard for the office in China, first on the pretext that it would be protection against MILFAM, but later he admitted that it was to protect his interests from Morrow. At the end of May 2026, he told Morrow to resign from Scully's Chinese subsidiary or be fired, which would potentially restrict him from working

ever again in China. He began telling the company's employees that Morrow was no longer its chief executive. Merkanti stopped paying Morrow after May 31, 2026 but never gave him notice of termination. IEM stopped paying Morrow and Boardwalk from May 1, 2026 but did not give notice of termination. His expenses stopped being reimbursed, including those related to his indemnification agreement.

42. When Morrow resigned from the Chinese subsidiary, an employee of that subsidiary took the passports of Morrow, his wife, and their children, for the stated purpose of cancelling their Chinese residence permits. While the family's passports were in the company's hands, Smith told Morrow by telephone that they would not be returned unless Morrow gave back a flash drive of company records that Smith claimed he had. Even though Morrow legitimately possessed the flash drive as the Chief Executive Officer and director of Scully, he acquiesced and his family's passports were returned.

43. On June 11, 2026, Smith had a letter delivered by hand and by courier to the Morrows' home in Groton. Written on the letterhead of a Vancouver company Smith controls and headed "IMPORTANT NOTICE," it accused Morrow of taking company records and of planning to sell them to "the Peter Kellogg Group, your new employer." It went on: "you have stated that you will now or have become Judgement Proof and have transferred all your assets to your spouse. If such conveyance has occurred or will occur, then all claims will be made also against you and your family." Smith then demanded that Morrow sign the letter. Morrow refused. A week later he and his family left China and came home to Massachusetts.[10]

44. On July 2, 2026 the Cayman court ruled that MILFAM's meeting had been invalid and its nominees had never taken office. The court held that the incumbent directors had no power

[10] Letter from M.J. Smith, President, Logan International Corp., to S. Morrow, June 11, 2026.

to postpone the meeting, but that MILFAM's representatives could not appoint a chairman in the directors' absence, so that no business could be conducted and none of MILFAM's nominees was elected. It found Morrow, who testified and was cross-examined at trial, to be an "honest and credible" witness.

45. On July 8, Scully announced to the market that its "Board of Directors and management remain unchanged," identified Morrow as its Chief Executive Officer and Chief Financial Officer, and withdrew the January filings announcing his termination as unauthorized. By then, Morrow and Boardwalk had not been paid in more than a month. The same day, Morrow received an email from Smith informing him that his corporate credit card had been cancelled.[11]

46. However, the victory in the Cayman Islands did not secure Smith's control. On July 31, 2026 the Kellogg group and MILFAM, now together holding approximately 48.5% of Scully, publicly disclosed their intention to replace Scully's board and management at the next shareholder meeting, with the possible exception of Morrow. Just three days after the disclosure, on Monday morning, August 3, 2026, Morrow was cut off from all of his corporate e-mails.

47. On August 11, 2026, Morrow gave Merkanti formal written notice of its default and demanded payment of the amounts then overdue. Merkanti (under the control of Smith) did not cure. Instead, on August 13, 2026 Scully announced that Smith had taken over as interim Chief Executive Officer and Chief Financial Officer and that Morrow was "now a non-executive director with no management duties with the Group."[12] In other words, Morrow was purportedly terminated.

---

[11] *MILFAM LLC v. Morrow*, Cause No. FSD 3 of 2026 (NSJ), [2026] CIGC (FSD) 54 (Grand Ct. Cayman Is. July 2, 2026) (the "Judgment") ¶¶ 8, 85; Scully Form 6-K and Form 6-K/A (July 8, 2026).

[12] Scully press release (Aug. 13, 2026).

48. Morrow's purported termination occurred at a meeting of Scully's board of directors held on August 8, 2026.[13] However, Morrow did not receive the notice of that meeting that Scully's Articles of Association require. Because Morrow did not receive the required notice before the meeting was held, the resolutions adopted at it, including any resolution purporting to remove Morrow as Chief Executive Officer and Chief Financial Officer, are void and of no effect. Whether or not that meeting validly removed him, Scully has held Smith out as its Chief Executive Officer and Chief Financial Officer since August 13, 2026, has excluded Morrow from management functions, and the Scully companies have paid him nothing.

49. Morrow's exclusion was not limited to the August 8 meeting. On information and belief, on multiple occasions since mid-2026, certain communications and materials concerning the business of Scully's board, and proposed or actual board actions, were sent to Scully's other directors but not to Morrow. On information and belief, Smith, as Scully's Chairman, intentionally and repeatedly excluded Morrow, a duly elected director, from those communications and decisions, in violation of the duties Smith owes to Scully as its Chairman and as a director. Smith's actions have made it impossible for Morrow to fully discharge his duties as a director.

50. The next shareholder meeting is expected within months. The Kellogg group and MILFAM, together holding approximately 48.5% of Scully, have publicly disclosed their intention to replace Scully's board and management, with the possible exception of Morrow. Smith is virtually guaranteed to be removed as a director and officer at that meeting. He knows that the incoming board may retain Morrow, who ran the company for five years and is familiar with its affairs.[14]

[13] Morrow was then, and remains, a director of Scully.

[14] Schedule 13D/A (July 31, 2026).

### G. Smith Threatens Morrow's Reputation and Career with Accusations He Knows Are False.

51. Having taken Morrow's job and stopped his pay, Smith began a series of threats to Morrow and his family. Over the following six weeks he sent them a series of letters and emails intended to pressure Morrow into staying silent and giving up what he is owed, and to discredit him before the new board arrives. On one call with Morrow, Smith threatened to "destroy" him.

52. On August 10, 2026, writing from his IEM account as IEM's "Authorized agent," Smith sent Morrow and his wife the Marshall Islands registration documents for Boardwalk and demanded that they sign, and notarize, a release of "all thing IEM Management have done for you both personally, corporately for your family and others over the years." In the same e-mail Smith wrote: "This company was established for both of you in the year 2020." Smith implied that this arrangement was somehow wrong or inappropriate, despite being arranged by him, approved by Scully's board of directors, and disclosed in Scully's filings with the SEC.

53. On August 28, 2026, writing as Scully's Chairman, Smith sent Morrow a draft Scully press release. Its headline read: "SCULLY COMMENCING ACTION AGAINST FORMER CEO, SAMUEL MORROW, AND OTHERS, TO, AMONG OTHER CLAIMS, RECOVER WRONGFULLY MISAPPROPRIATED FUNDS." It announced a suit against "Samuel Morrow, C.F.A., of Groton, Massachusetts," his wife, Boardwalk, and a former Boardwalk director to recover "approximately CDN $2.2 million." This claim was false, and Smith knew it. Morrow had "misappropriated" nothing. It was, in fact, Scully and its subsidiaries and affiliates that owed Morrow millions of dollars under the various contracts it and related entities made with Morrow and his related entities. Smith knew that a press release proclaiming "MISAPPROPRIATED FUNDS" would severely damage Morrow's prospects of future employment, and he used the draft as leverage against him.

54. On September 2, 2026 Smith sent Morrow an e-mail titled “Sherwood,” with no message, attaching five files labeled “money received in 2021” through “money received in 2025”: a tally of what Smith’s own company had paid the Morrows’ company under the arrangement Smith’s own company had set up. The implication here was that Morrow had done something wrong or inappropriate, but again, this arrangement had been arranged by Smith, approved by Scully’s board of directors, and disclosed in Scully’s filings with the SEC.

55. On September 8, 2026 Smith sent Morrow an e-mail, with no subject and no message, attaching a memorandum listing Morrow’s name, the address and e-mail of the CFA Institute’s professional-conduct office, and the instructions “Send you CFA number” and “Confirm all correct.” The message implied that Smith intended to report Morrow to the CFA Institute and to seek the revocation of his CFA designation.

56. On September 23, 2026, writing as Scully’s Chairman, Smith sent a letter to Morrow, to his wife, and to Joanna Trew (a former director of Boardwalk) with copies to Morrow’s elderly parents, David and Sue Anne Morrow. Addressed to “Everybody,” it accused them of “searching to buy many companies for your own accounts and family while Samuel Morrow was working full time for our company,” asserted that “all of your assets was moved from Samuel Morrow’s ownership to that of a shell company now owned by relatives,” and announced, in red type, “We give to all just one time a chance to explain your actions now.” It demanded a written response by October 1, 2026, or “our lawyers” would “process with the litigation against all of you.” It closed, again in red: “All of your participants govern yourselves accordingly.” Every one of these accusations is nonsense, and Smith knows it.

57. The “shell company” is Boardwalk. Smith’s own company incorporated Boardwalk for the Morrows in 2020, as Smith himself wrote on August 10. Smith’s own company

paid it for five years,[15] under a written agreement, for services Morrow performed. Smith recommended the structure, and Scully has disclosed it in its SEC filings since 2021, reporting that Morrow and "a company controlled by him" had entered into agreements providing for "an aggregate annual salary and fees," and that Morrow's compensation included "fees and incentive plan payments made to a controlled company."[16] The arrangement was consistent with Morrow's agreements with the Scully group, and the Board of Scully approved it.

58. The "misappropriated funds" are the payments the Scully companies made to Morrow and to Boardwalk under their written contracts. The largest of them, the $1,176,000 paid to Morrow, is the amount Scully's board, with Smith on it, disclosed to shareholders as being due to Morrow in these circumstances,[17] and it was paid on Smith's instruction. Smith's assertion that Morrow and his family bought companies for themselves while he worked for Scully identifies no company, no opportunity, and does not identify any transaction that violated an agreement or duty.

59. Nor was the threat to report Morrow to the CFA Institute a legitimate inquiry. Rather than simply identifying the alleged misconduct and pursuing whatever formal process Smith considered appropriate, Smith instead directed the threat of a CFA complaint at Morrow personally and, in his September 23 letter, extended his threats to Morrow's wife and parents.

### H. Smith Threatens Victoria Morrow with Litigation on a Fictitious Claim.

60. Smith also threatened Morrow's wife, Victoria. Victoria Morrow has never worked for, contracted with, or held any office in any Scully company. She is a party to none of the

[15] Boardwalk was paid by a Scully subsidiary until October 2025.

[16] Scully Royalty Ltd., Proxy Statement for 2022 Annual General Meeting, "Employment Agreements" (furnished on Form 6-K), https://www.sec.gov/Archives/edgar/data/16859/000110465922123992/tm2231502d1_6k.htm; Scully Royalty Ltd., Proxy Statement for 2023 Annual General Meeting, "Employment Agreements" (furnished on Form 6-K), https://www.sec.gov/Archives/edgar/data/16859/000110465923122745/tm2331630d1_6k.htm; 2025 Proxy Statement at 11 n.5; Scully Royalty Ltd., Annual Report (Form 20-F) for the year ended Dec. 31, 2023, Item 6.B n.4, https://www.sec.gov/Archives/edgar/data/16859/000141057824000552/srl-20231231x20f.htm.

[17] 2025 Proxy Statement at 13.

agreements at issue. Her only connection to this dispute is that she is married to Morrow and is a member of the family company that Smith's own firm formed for her and her husband in 2020.

61. Yet Smith has demanded that she sign a notarized release, named her as a defendant in his threatened press release, accused her of holding her husband's assets in a "shell company," and threatened to sue her unless she explains herself in writing by October 1, 2026. No Defendant has identified any agreement under which she owes anything, any property of any Defendant that she holds, or any transaction by which she received anything in fraud of any creditor. The threatened claims identify no contractual or other legal basis on which Victoria Morrow is liable.

**I. Defendants Owe Morrow and Boardwalk Recovery.**

62. At least part of what Smith is trying to do is for Morrow to give up significant sums owed to him by Scully and related companies.

63. Merkanti has paid Morrow nothing since May 31, 2026. It owes him his unpaid salary, benefits, and retirement contributions; his unreimbursed expenses and indemnification amounts; and, because it failed to cure after written notice, the default payment required by the Employment Agreement, together with contractual interest and his legal fees.[18]

64. IEM has paid Morrow nothing since April 30, 2026 and owes him, at a minimum, pay in lieu of the notice required by the IEM Contract.[19]

65. IEM made a partial payment to Boardwalk but never gave notice of termination and stopped making payments without justification. A Default has occurred under the Boardwalk

[18] Employment Agreement §§ 3.7, 4.8.

[19] IEM Contract cls. 4.1, 8.1.

Agreement, and IEM owes Boardwalk the default payment the Agreement requires, together with contractual interest and Boardwalk's legal fees.[20]

66. Scully and Merkanti owe Morrow and Boardwalk the vested shares approved for issuance to each of them, or their value.

67. In sum, Morrow has nothing to hide, and he brings this action because Smith's threats have left him no alternative. Through this lawsuit, Morrow intends to settle all accounts with Defendants, obtain what is owed to him, and protect his good name.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract — Employment Agreement
### (Unpaid Compensation, Benefits, Reimbursements, and Accrued Benefits)
### (Morrow against Merkanti)

68. Morrow repeats and incorporates by reference the allegations of paragraphs 1 through 67.

69. The Employment Agreement is a valid and binding contract between Morrow and Merkanti, supported by adequate consideration.

1. Morrow performed his obligations under the Employment Agreement. He served as President, Chief Executive Officer, and Chief Financial Officer of the group through at least August 13, 2026,[21] including throughout the months in which Merkanti stopped paying him.

2. Section 3.7 of the Employment Agreement obliges Merkanti to pay Morrow a Base Salary, to provide specified insurance and retirement benefits, and to reimburse the reasonable business expenses Morrow incurs in performing his duties. Section 4.3(a) and Section 10.7 further

---

[20] Boardwalk Agreement cls. 5, 8. Boardwalk has given IEM written notice of non-payment and breach under clause 8.1 of the Boardwalk Agreement. Should IEM cure within the period the Agreement allows, Plaintiffs will amend this Complaint accordingly.

[21] As pleaded herein, Morrow contests the validity of the August 8, 2026 board meeting that purported to remove him.

oblige Merkanti, upon a termination of Morrow's employment other than for Just Cause, to pay all Accrued Benefits promptly after the Date of Termination.

3. Merkanti breached the Employment Agreement by failing to pay Morrow's Base Salary and benefits after May 31, 2026; by failing to make the retirement contributions due from October 1, 2025; by failing to reimburse Morrow's expenses and indemnification amounts; and by failing to pay his Accrued Benefits when due after August 13, 2026, or at any time since.

4. As of August 11, 2026, substantial amounts were due and unpaid under these provisions, as identified in Morrow's written notice of default. Further amounts accrued through the Date of Termination.

5. As a direct and proximate result of Merkanti's breaches, Morrow has been damaged in an amount to be proven at trial, together with contractual interest under Section 4.8(e) of the Employment Agreement from the date each amount fell due until paid.

**COUNT II**
**Breach of Contract — Employment Agreement § 4.8**
**(Default Payment)**
**(Morrow against Merkanti)**

6. Morrow repeats and incorporates by reference the allegations of paragraphs 1 through 67.

7. Section 4.8(a) of the Employment Agreement provides that Merkanti is in default if it breaches a material obligation of the Agreement, including the timely payment of compensation and the provision of benefits, and fails to cure the breach within the cure period following written notice from Morrow. Section 4.8(b) provides that upon default Merkanti must make a specified lump-sum payment to Morrow, in addition to his Accrued Benefits, within a short period thereafter.

8. Merkanti's failure to pay Morrow's salary, benefits, retirement contributions, and reimbursements, as alleged in Count I, was a breach of material obligations of the Employment Agreement.

9. On August 11, 2026, Morrow delivered written notice of default to Merkanti at its notice address under Section 10.14 of the Employment Agreement, in care of Scully in Grand Cayman. The notice invoked Section 4.8, identified the unpaid amounts, and stated that if the default was not cured within the cure period the payment required by Section 4.8(b) would become due.

10. Merkanti did not cure within the cure period, which expired on August 25, 2026, and has not cured since. Merkanti is in default under Section 4.8(a), and the payment required by Section 4.8(b) fell due no later than September 1, 2026. Merkanti has paid none of it.

11. Scully's board, with Smith sitting on it, approved the Employment Agreement and disclosed its principal terms to shareholders.

12. The payment required by Section 4.8(b) arises from Merkanti's breach of, and default under, its payment obligations during Morrow's employment. It is not a payment relating to Morrow ceasing to be an officer or director of Merkanti, Scully, or any affiliate.

13. As a direct and proximate result of Merkanti's breach, Morrow has been damaged in an amount to be proven at trial, together with contractual interest under Section 4.8(e) from the date the payment fell due until paid.

**<u>COUNT III</u>**
**Breach of Contract — Undelivered Shares**
**(Morrow and Boardwalk against Scully and Merkanti)**

14. Morrow and Boardwalk repeat and incorporate by reference the allegations of paragraphs 1 through 67.

15. In May 2025, Scully's Board of Directors approved the issuance of vested common shares of Scully to Morrow and to Boardwalk, in settlement of Morrow's outstanding stock options. Morrow's options were cancelled in exchange. The Board's approval and the resulting award constituted a binding agreement by Scully to issue and deliver those shares, supported by consideration.

16. Merkanti, as Morrow's employer, was obliged under Section 3.7 of the Employment Agreement to provide Morrow the equity awards granted to him under the plans of Merkanti and Scully, and is liable for the failure to deliver them.

17. Morrow has requested that the shares be delivered. Neither Morrow nor Boardwalk has received them. On information and belief, the shares were delivered instead to a fiduciary under Smith's control, which, at Smith's direction, has refused to release them.

18. Scully and Merkanti have breached their obligations by failing and refusing to deliver the shares.

19. Morrow and Boardwalk are entitled to specific performance compelling Scully and Merkanti to deliver the shares approved for issuance to each of them, together with all dividends and distributions paid on those shares since their issuance. In the alternative, Morrow and Boardwalk seek damages equal to the greater of the value of the shares when they should have been delivered or their value at the time of judgment.

**COUNT IV**
**Breach of Contract — IEM Contract**
**(Notice Pay and Unpaid Wages)**
**(Morrow against IEM)**

20. Morrow repeats and incorporates by reference the allegations of paragraphs 1 through 67.

21. The IEM Contract is a valid and binding contract between Morrow and IEM, governed by the laws of Hong Kong. Under it, IEM employed Morrow at a monthly salary and agreed that his employment could be terminated only on a specified period of written notice or payment in lieu of notice.

22. Morrow performed his obligations under the IEM Contract.

23. IEM stopped paying Morrow after April 30, 2026. It never gave him written notice of termination and never paid him in lieu of notice. IEM's cessation of all payment was a repudiation of the IEM Contract.

24. As a direct and proximate result of IEM's breach, Morrow has been damaged in an amount to be proven at trial, including pay in lieu of the notice required by the IEM Contract, together with any wages and statutory entitlements accrued and unpaid under the IEM Contract and the Hong Kong Employment Ordinance (Cap. 57), and interest.

**COUNT V**
**Breach of Contract — Boardwalk Agreement**
**(Default Payment, Fees, and Interest)**
**(Boardwalk against IEM)**

25. Boardwalk repeats and incorporates by reference the allegations of paragraphs 1 through 67.

26. The Boardwalk Agreement is a valid and binding contract between IEM and Boardwalk, formerly known as Boardwalk Ltd. and before that as Sherwood Ltd., the "ServicesCo" party to the Agreement. It is supported by adequate consideration.

27. Boardwalk performed its obligations under the Boardwalk Agreement, including by providing Morrow's services to IEM and the Scully group.

28. Clause 1.2.1.3 of the Boardwalk Agreement defines a "Change of Control" in terms materially the same as Section 2.2(f)(iii) of the Employment Agreement, which Scully has publicly

disclosed, and includes the solicitation of a dissident proxy. Clause 8.1(d) makes a Change of Control not approved by Boardwalk that materially affects Boardwalk's rights an event of Default.

29. MILFAM's dissident proxy solicitation was a Change of Control under the Boardwalk Agreement. Boardwalk did not approve it. The Change of Control materially affected Boardwalk's rights: in its wake, and as a result of the contest for control that it began, IEM stopped paying Boardwalk from May 1, 2026 and has paid nothing since. A Default therefore occurred under clause 8.1(d).

30. IEM's failure to pay the fees due to Boardwalk is also a breach of a material provision of the Boardwalk Agreement. Boardwalk has also given IEM written notice of non-payment and breach under clause 8.1(a) and (b). If IEM does not remedy within fifteen days of that notice, a further Default will arise on those grounds as well.

31. Upon a Default, clause 8.2 entitles Boardwalk, without prejudice to its other rights and remedies, to a specified lump-sum default payment, to payment of all outstanding amounts, to reimbursement of its legal fees and costs of enforcement, and to contractual interest on overdue amounts. Clause 8.3 provides that these remedies are cumulative.

32. IEM has made none of the payments clause 8.2 requires, and has thereby breached the Boardwalk Agreement.

33. As a direct and proximate result of IEM's breach, Boardwalk has been damaged in an amount to be proven at trial, together with all outstanding fees, its legal fees and costs of enforcement under clause 8.2(d), and interest under clause 8.2(e).

**COUNT VI**
**Breach of Contract — Employment Agreement § 4.8(d) and Article 9**
**(Advancement of Legal Fees and Indemnification)**
**(Morrow against Merkanti)**

34. Morrow repeats and incorporates by reference the allegations of paragraphs 1 through 67.

35. Section 4.8(d) of the Employment Agreement obliges Merkanti to bear, and to advance as they are incurred, the legal fees and costs Morrow reasonably incurs to enforce his rights under Article 4 of the Agreement. A failure to advance those fees is itself a material breach of the Agreement.

36. This action enforces Morrow's rights under Article 4, including Sections 4.3 and 4.8. Morrow has incurred, and will continue to incur, legal fees and costs in doing so (including this lawsuit and matters related to it). Merkanti has advanced none of them, and by ceasing all payment to Morrow and refusing to cure its defaults, it has repudiated its obligation to do so.

37. Article 9 of the Employment Agreement obliges Merkanti to indemnify Morrow against costs, including attorneys' fees, incurred in proceedings to which Morrow is made a party by reason of his service as an officer, director, or agent of Merkanti, Scully, or their affiliates.

38. Morrow was made a party to *MILFAM LLC v. Morrow*, Cause No. FSD 3 of 2026 (NSJ), in the Grand Court of the Cayman Islands, solely by reason of his service as Scully's President, Chief Executive Officer, and Chief Financial Officer. Merkanti has not fully indemnified him for the costs he incurred in that proceeding, or in any other proceeding to which he has been made a party by reason of his service.

39. As a direct and proximate result of Merkanti's breaches, Morrow has been damaged in an amount to be proven at trial, without duplication of the amounts claimed in Count I. Morrow

is further entitled to an order requiring Merkanti to advance, as they are incurred, the legal fees and costs of this action.

**COUNT VII**
**Declaratory Judgment, 28 U.S.C. §§ 2201–2202**
**(Morrow against Scully, Merkanti, and Smith)**

40. Morrow repeats and incorporates by reference the allegations of paragraphs 1 through 67.

41. An actual, substantial, and justiciable controversy exists between Morrow, on the one hand, and Scully, Merkanti, and Smith, on the other. Defendants have asserted in writing that Morrow "wrongfully misappropriated" approximately CDN $2.2 million; have transmitted a draft press release announcing an action against Morrow to recover those funds; have accused Morrow of diverting business opportunities and moving assets to a "shell company"; have stated that they will sue Morrow and his family if he does not explain himself in writing by October 1, 2026; and have treated the August 8, 2026 board meeting as having removed Morrow from his offices. Morrow denies each accusation. Every payment he or Boardwalk received was contractually due and properly paid, and he engaged in no wrongdoing. Morrow contends that the August 8, 2026 meeting was not duly convened and that its resolutions are of no effect.

42. MILFAM's solicitation of proxies to replace a majority of Scully's board was a Change of Control under Section 2.2(f)(iii) of the Employment Agreement, deemed to have occurred immediately before the solicitation. Morrow was not part of any group that solicited proxies and did not consent to the Change of Control. He initially opposed it, alongside the incumbent board.

43. Under either outcome of the contest for control, Morrow's employment was terminated other than for Just Cause in connection with that Change of Control. If the MILFAM board had authority to act for Scully, it terminated Morrow on January 12, 2026, at the time of the

Change of Control, without identifying any act constituting Just Cause. If it did not, as the Grand Court held, then Morrow's removal on August 13, 2026 was a termination other than for Just Cause, made in contemplation of the Change of Control and the incoming board's possible retention of him. Morrow pleads these alternatives without conceding that the August 8, 2026 board meeting was valid. In either event, Section 4.3(d) entitled Morrow to a lump-sum payment.

44. That payment was made at Smith's instruction, by Smith's assistant. Morrow has not been, and does not seek to be, paid twice.

45. Morrow therefore seeks declarations as follows:

(a) MILFAM's proxy solicitation was a Change of Control within the meaning of Section 2.2(f)(iii) of the Employment Agreement;

(b) Morrow's employment was terminated other than for Just Cause at the time of, in contemplation of, or within six months after that Change of Control;

(c) the resulting payment to Morrow was due under Section 4.3(d) of the Employment Agreement and was properly authorized and paid;

(d) Scully and Merkanti have no right under the Employment Agreement to recover that payment from Morrow as "misappropriated funds" on the basis described in the draft press release;

(e) Morrow did not misappropriate funds in connection with the change-of-control payment described herein;

(f) Morrow did not usurp any corporate opportunity of Scully or its subsidiaries by any acquisition activity of the kind alleged in the September 23 Letter;

(g) Morrow did not transfer any asset to Victoria Morrow, Joanna Trew, Boardwalk, or any other person with intent to hinder, delay, or defraud any Defendant, and no such transfer is avoidable at the instance of any Defendant;

(h) the meeting of Scully's board of directors held on or about August 8, 2026 was not duly convened, because Morrow, a director of Scully, did not receive the notice of that meeting required by Scully's Articles of Association, and any resolution adopted at that meeting, including any resolution purporting to remove Morrow as Chief Executive Officer and Chief Financial Officer of Scully, is void and of no effect; and

(i) Morrow has been prevented from fully discharging his duties as a Scully director because of Smith's failure to keep him apprised of board communications, his exclusion of Morrow from board meetings, and the other actions described herein.

46. A declaration with regard to these contractual and threatened disputes will clarify the parties' legal relations and will resolve the uncertainty concerning the payment, the threatened recovery claim, and the purported August 8, 2026 removal.

**<u>COUNT VIII</u>**
**Declaratory Judgment, 28 U.S.C. §§ 2201–2202**
**(Victoria Morrow against Scully, IEM, and Smith)**

47. Victoria Morrow repeats and incorporates by reference the allegations of paragraphs 1 through 67.

48. An actual, substantial, and justiciable controversy exists between Victoria Morrow, on the one hand, and Scully, IEM, and Smith, on the other. Smith, writing as Chairman of Scully and as an agent of IEM, has demanded a notarized release from Victoria Morrow; has named her as a defendant in a threatened action to recover approximately CDN $2.2 million; has accused her of owning a "shell company" to which Morrow's assets were moved; and has threatened to sue

her unless she explains herself in writing by October 1, 2026. The threatened claims identify no agreement imposing liability on Victoria Morrow, no property of Scully or IEM that she holds, and no identified transfer made with intent to defraud either company.

49. Victoria Morrow therefore seeks a declaration that:

(a) she is not a party to, and has no obligation under, the Employment Agreement, the IEM Contract, the Boardwalk Agreement, or any other agreement with Scully, IEM, or Smith;

(b) she has no contractual liability to Scully, IEM, or Smith;

(c) she holds no property of Scully, IEM, or Smith;

(d) her membership in Boardwalk does not make her personally liable for Boardwalk's contractual obligations to IEM or for the amounts described in the threatened press release;

(e) she received no transfer from Morrow made with intent to hinder, delay, or defraud Scully, IEM, or Smith, and no transfer to her is avoidable at the instance of Scully, IEM, or Smith; and

(f) none of Scully, IEM, or Smith has any claim against her arising from the matters described in the draft press release, the September 23 Letter, or otherwise alleged in this Complaint.

50. A declaration will clarify whether Victoria Morrow has any contractual or threatened asset-transfer liability arising from the specific demands made by Smith and/or on behalf of Scully and IEM.

**COUNT IX**
**Tortious Interference with Contractual Relations**
**(Morrow and Boardwalk against Smith)**

51. Morrow and Boardwalk repeat and incorporate by reference the allegations of paragraphs 1 through 67.

52. The Employment Agreement, the IEM Contract, and the Boardwalk Agreement are valid contracts between Morrow or Boardwalk, on the one hand, and Merkanti or IEM, on the other.

53. Smith knew of each agreement and their material obligations. He sat on the Scully board that approved the Employment Agreement and its disclosure to shareholders; he signed the IEM Contract on IEM's behalf; and IEM, a company he directs and controls, formed Boardwalk and administered the Boardwalk Agreement. Smith also knew that the agreements provided for payments, cure rights, default payments, fees, and delivery of the shares at issue.

54. Smith knowingly induced and caused Merkanti and IEM to breach those contracts. He caused them to stop paying Morrow and Boardwalk; caused Merkanti to ignore Morrow's notice of default and refuse to cure; and caused the shares granted to Morrow and Boardwalk to be withheld by a fiduciary under his control.

55. Smith did so with actual malice, for purposes of his own unrelated to any legitimate interest of Merkanti, IEM, or Scully, and by improper means. He acted to retaliate against Morrow for declining to pledge personal loyalty to Smith over the company's lawful board, to preserve Smith's personal control of Scully against the wishes of its largest shareholders, and to deprive the incoming board of an experienced executive who could assist it in the transition. The interference was outside any legitimate corporate interest in performing the agreements and was carried out by improper means, including by conditioning the return of the passports of Morrow's wife and children on Morrow's surrender of company records, by threatening in his September 8, 2026 e-

mail to report Morrow to the CFA Institute, and by directing that Morrow and Boardwalk be paid nothing while Merkanti ignored Morrow's notice of default. These acts, together with the course of conduct described in paragraphs 40 through 51, support the inference that Smith acted with the purpose of causing the contractual breaches and of obtaining Morrow's silence and relinquishment of his contractual rights.

56. As a direct and proximate result of Smith's interference, Morrow and Boardwalk have been deprived of the payments and shares owed to them and have suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. On Count I, awarding Morrow damages against Merkanti in an amount to be proven at trial;

B. On Count II, awarding Morrow damages against Merkanti in an amount to be proven at trial;

C. On Count III, ordering Scully and Merkanti to deliver to Morrow and to Boardwalk the Scully shares approved for issuance to each of them, together with all dividends and distributions paid on them, or in the alternative awarding each of Morrow and Boardwalk damages equal to the value of those shares;

D. On Count IV, awarding Morrow damages against IEM in an amount to be proven at trial;

E. On Count V, awarding Boardwalk damages against IEM in an amount to be proven at trial, together with its legal fees and costs under clause 8.2(d) of the Boardwalk Agreement;

F. On Count VI, awarding Morrow damages against Merkanti in an amount to be proven at trial, and ordering Merkanti to advance the legal fees and costs of this action as they are incurred, pursuant to Section 4.8(d) of the Employment Agreement;

G. On Count VII, entering the declarations set out in paragraph 114 and its subparagraphs;

H. On Count VIII, entering the declarations set out in paragraph 118 and its subparagraphs;

I. On Count IX, awarding Morrow and Boardwalk damages against Smith in an amount to be proven at trial;

J. Awarding pre-judgment interest at the contractual rates provided in Section 4.8(e) of the Employment Agreement and clause 8.2(e) of the Boardwalk Agreement, or the maximum rate permitted by law if lower, and otherwise at the applicable statutory rate, together with post-judgment interest;

K. Awarding Plaintiffs their costs of suit; and

L. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Grace V.B. Garcia*

Grace V.B. Garcia (BBO # 640970)
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
Tel.: (617) 737-8822
ggarcia@morrisonmahoney.com

David Sillers (*pro hac vice* motion forthcoming)
HILGERS PLLC
8750 N. Central Expressway, Suite 750
Dallas, TX 75231
Tel.: (469) 727-8686
DSillers@HilgersLaw.com

Attorneys for Plaintiffs Samuel S. Morrow,
Victoria Morrow, and Boardwalk LLC

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 28, 2026.

*/s/ Grace V.B. Garcia*